UNITED STATES of America,
Plaintiff–Appellee,

v.

Derek Duane PAGE, Defendant–
Appellant.

No. 96–4083.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 23, 1997.

Decided Feb. 12, 1998.

**482**

Deborah A. Solove (argued and briefed), Office of the U.S. Attorney, Columbus, OH, for Plaintiff–Appellee.

Thomas M. Tyack (argued and briefed), Tyack, Blackmore & Liston, Columbus, OH, for Defendant–Appellant.

Before: MERRITT, WELLFORD, and MOORE, Circuit Judges.

MERRITT, J., delivered the opinion of the court. WELLFORD, J. (pp. 488–490), delivered a separate concurring opinion. MOORE, J. (pp. 490–495), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

MERRITT, Circuit Judge.

The Violence Against Women Act, adopted in 1994, has two criminal provisions, one of which forbids interstate travel for the purpose of committing domestic violence, and the other of which forbids domestic violence during or as a result of such interstate travel. In the direct criminal appeal now before us, the defendant, Derek Page—before traveling interstate—brutally beat and injured his live-in girlfriend. He injured her in Columbus, Ohio, and then drove her to Washington, Pennsylvania, where he left her for treatment at a hospital. Although the beating occurred entirely in Page's home in Ohio, the prosecution presented evidence that the victim's injuries worsened during the trip to Pennsylvania. This appeal presents two questions regarding the scope of the new statute: first, whether it criminalizes domestic violence that occurs before interstate travel begins; and second, whether it criminalizes intentional violent conduct during interstate travel that results in the aggravation of injuries inflicted earlier.

The precise language of the statute is important. Section 2261(a)(1) criminalizes the actions of a "person who travels across a State line ... with the intent to injure" a "spouse or intimate partner" and who does in fact injure that person "in the course of or as a result of such travel," and (a)(2) criminalizes the conduct of one who "commits a crime of violence and thereby causes bodily injury to the person's spouse or intimate partner," "in the course or as a result of" causing him or her "to cross a State line ... by force,

coercion, duress, or fraud."[1] Following the longstanding "canon of strict construction of criminal statutes, or rule of lenity, [that] ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered," *United States v. Lanier,* — U.S. —, —, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997) (citing numerous cases), we conclude that this statute does not criminalize domestic violence that occurs prior to interstate travel. Rather, the statute only covers domestic violence occurring "in the course or as a result of" such travel. Interpreted this way, the statute criminalizes the aggravation of injuries inflicted before interstate travel only so long as the worsening of the injuries was caused by intentional violent conduct during interstate travel. Because the jury was not instructed on the proper interpretation of the statute, we reverse the defendant's conviction and remand for retrial.

## I.

On November 2, 1995, a grand jury returned a two-count indictment charging Derek Page with kidnapping and interstate domestic violence. His first trial ended in a hung jury. At Page's second trial, the jury acquitted him of kidnapping but found him guilty of interstate domestic violence, in violation of 18 U.S.C. § 2261(a)(2). The District Court denied Page's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and sentenced him to fifty-seven months in prison. It is this ruling that Page appeals.

The evidence at trial showed that on the evening of July 24, 1995, Page's live-in girlfriend, Carla Scrivens, visited his condominium in Columbus, Ohio, where a physical confrontation ensued. The prosecution presented evidence that Page sprayed Scrivens with pepper spray and beat her over the course of several hours with his fists, a claw hammer, and a pipe wrench. Approximately two hours after the beating had ceased, Page carried Scrivens to his car and drove her to Washington, Pennsylvania, where he left her in the emergency room of a hospital. The prosecution adduced evidence that Page forced Scrivens to take this journey by threatening her with further violence and with the use of a stun gun. There was also evidence that during the drive to Pennsylvania, Page made additional threats and that Scrivens's injuries worsened through bleeding and swelling.

## II.

■ Page was convicted under § 2261(a)(2), the scope of which has not been addressed by this or any other appellate court. Conviction under § 2261(a)(2) requires the prosecution to prove that the defendant: (1) caused his or her spouse or intimate partner to cross a state line (2) by force, coercion, duress, or fraud, and (3) in the course or as a result of that conduct, (4) intentionally committed a crime of violence, (5) thereby causing bodily injury to the spouse or intimate partner. On appeal, Page appears to concede that he used coercion, force, or duress to cause Scrivens to travel interstate and that he caused bodily injury to Scrivens during a physical altercation before travel began.

Page's appeal rests on the timing of the violence that caused Scrivens's injuries. Referring to the precise language of § 2261(a)(2), he claims that the prosecution failed to establish that the act of violence that caused bodily injury to Scrivens occurred "in the course or as a result of that conduct." He argues that the term "that

---

1. The provision in question, 18 U.S.C. § 2261(a), reads in full as follows:

    2261. Interstate domestic violence

    (a) Offenses.—

    (1) CROSSING A STATE LINE.—A person who travels across a State line or enters or leaves Indian country with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner, shall be punished as provided in subsection (b).

    (2) CAUSING THE CROSSING OF A STATE LINE.—A person who causes a spouse or intimate partner to cross a State line or to enter or leave Indian country by force, coercion, duress, or fraud and, in the course or as a result of that conduct, intentionally commits a crime of violence and thereby causes bodily injury to the person's spouse or intimate partner, shall be punished as provided in subsection (b).

conduct" refers to the act of traveling interstate. Accordingly, he contends that the words "crime of violence [causing] bodily injury" require the prosecution to prove that a separate act of violence occurred during or as a result of interstate travel. Page maintains that the violent conduct which caused Scrivens's bodily injuries ceased before he drove her to Pennsylvania and that no act of violence causing bodily injury to Scrivens occurred during or as a result of the travel. As such, he argues that the statute does not apply.

The prosecution argues that "that conduct" looks both at the acts constituting the interstate travel and at the "force, coercion, duress, or fraud" used in causing the travel. The prosecution relies on a "single episode" theory of the crime, arguing that it makes no difference exactly when the injury occurred. It contends that the term "that conduct" includes Page's beating of Scrivens because this beating "was instrumental in causing the victim's interstate transportation." In other words, the prosecution maintains that the same course of violent conduct that caused Scrivens's bodily injuries also caused her to cross the state line. Under the prosecution's reading, § 2261(a)(2) would reach any instance of domestic violence occurring before interstate travel, provided that there is some link between the violence causing the victim's bodily injury and the force, coercion, duress, or fraud used in causing the victim to cross the state line.

The District Court adopted this reading of the statute in denying Page's motion for a judgment of acquittal, stating that "there is no evidence whatsoever that Congress somehow sought to exclude from the Act's protection domestic violence victims who had the misfortune of being beaten before, as opposed to during or after, their transportation across state lines." Dist. Ct. at 5–6, J.A. at 210–11. The court concluded that although

the statute "require[s] there to be a nexus or relationship between the forced interstate transportation and the infliction of bodily injury," such a connection had been established. Dist. Ct. at 6, J.A. at 211. The court held that the prosecution had presented evidence sufficient to allow a reasonable jury to "conclude that the attack on Ms. Scrivens in Columbus, Ohio, and her subsequent transportation to Washington, Pennsylvania, was all part of a single episode or series of events," thus establishing the requisite connection. *Id.*

Section 2261(a) is the product of compromise among contending forces arguing for a broad federal statute outlawing any domestic violence against women that affects commerce and those arguing against the federalization of state domestic relations matters. It is not a model of clarity. Nevertheless, the provision's language fails to support the "single episode" or "continuing assault" theory adopted by the District Court and urged by the prosecution on appeal. Section 2261(a)(1) appears to criminalize the conduct of a person who travels across a state line for the purpose of committing an act of violence on a spouse or partner, and who thereafter commits such an act. Section 2261(a)(2), on the other hand, targets violence that occurs during, or as a result of, interstate travel. The statute's language simply does not appear to reach violent acts that occur before interstate travel begins. We must enforce the statute according to the words that Congress actually adopted and not according to our own view of what might be a better or more comprehensive statutory policy on domestic violence against women.

The provision's legislative history precludes the "single episode" theory. The statute, as originally proposed in 1990, was much broader than the present version.[2] It proposed to criminalize any domestic violence "in interstate commerce." *See* S.Rep. No.

2. The 1990 proposal stated as follows:
   § 2261. Traveling to commit spousal abuse
   (a) IN GENERAL.—Any person who travels or causes another (including the intended victim) to travel across State lines or in interstate commerce and who, during the course of any such travel or thereafter, does an act that injures his or her spouse or intimate partner in

violation of a criminal law of the State where the injury occurs, shall be fined not more than $1,000 or imprisoned for not more than 5 years but not less than 3 months, or both, in addition to any fine or term of imprisonment provided under State law.
S. Rep. No. 101–545, at 15 (1990).

101–545, at 15 (1990). Concerned about encroaching upon the traditional jurisdiction of the states over domestic relations matters, and in light of the federal courts' traditional reluctance to federalize this field, *see Ankenbrandt v. Richards,* 504 U.S. 689, 703, 112 S.Ct. 2206, 2214–15, 119 L.Ed.2d 468 (1992) (reaffirming the longstanding domestic relations exception to diversity jurisdiction, which divests the federal courts of authority to issue divorce, alimony, and child custody decrees), Congress rejected the broad proposal and chose to limit the scope of the statute to "bodily injury" that occurs during ("in the course [of]") or after ("as a result of") crossing a state line. This congressional action removed from federal criminal jurisdiction domestic violence "in interstate commerce" and limited the reach of the provision to violence "in the course or as a result of" interstate travel. This narrowing means that domestic violence occurring before such travel commences—violence that may affect interstate commerce or cause later travel—must be excluded. The prosecution's "single episode" argument is an attempt to create by judicial interpretation the proposed statute that Congress declined to adopt.

The Senate Report accompanying the 1993 version of the provision furnishes further support for Page's interpretation. This proposal employed much of the same language—and the same use of the term "that conduct"—as the final version.[3] The accompanying Senate Report states that § 2261(a)(2) "covers cases where the defendant has forced a spouse or intimate partner to cross State lines, and injury or abuse occurs during the course of or as a result of *this travel.*" S.Rep. No. 103–138, at 61 (1993) (emphasis added). This report also states that the provision "creates a Federal remedy for interstate crimes of abuse including crimes committed against spouses or intimate partners *during interstate travel . . . .*" *Id.* at 43 (emphasis added). This language demonstrates that Congress intended the term "that conduct" to refer to interstate travel and not to conduct occurring before such travel.

The Senate Report's statement that "that conduct" means interstate travel, combined with the substantial narrowing of the statute between 1990 and 1994, demonstrates that Congress intended the statute to require discrete acts of violence, occurring during or as a result of interstate travel, resulting in bodily injury. Congress did not intend for the prosecution to be able to establish violation of § 2261(a)(2) simply by showing a loose connection between interstate travel and violent acts, occurring before interstate travel, that actually caused the victim's physical injuries. Violence occurring before interstate travel cannot provide a basis for conviction under the statute. To hold otherwise would restore the broad reach of the proposal rejected by Congress in favor of the more limited provision ultimately enacted.

The prosecution contends that its interpretation of the statute is the only sensible one, asserting that Page's construction would so narrow the statute that it would only cover the defendant who "continue[d] to drive with one hand and to hit his victim with the other while they were crossing the state lines." Obviously it is wrong to suggest that the statute only criminalizes acts of violence occurring at the moment a state line is crossed. Rather, it reaches any crime of violence, resulting in bodily injury, that occurs during or as a result of interstate travel induced by force, coercion, duress, or fraud.

### III.

The prosecution's second argument is better. It argues in the alternative that even if § 2261(a)(2) requires violent conduct resulting in bodily injury to occur during the interstate travel, Page's conduct meets this standard. Since the jury acquitted Page of kidnapping, the Department maintains that the threats of violence Page allegedly made during the trip from Ohio to Pennsylvania constituted a "crime of violence" under the

---

**3.** The 1993 Senate bill included a proposed version of § 2261(a)(2) that provided as follows: CAUSING THE CROSSING OF A STATE LINE.—Any person who causes a spouse or intimate partner to cross a State line by force, coercion, duress or fraud and, in the course or as a result of that conduct, commits an act that injures his or her spouse or intimate partner shall be punished as provided. . . .

S. Rep. No. 103–138, at 20 (1993).

meaning of the statute. The prosecution further contends that these threats resulted in "bodily injury" to the extent that they kept Scrivens from receiving medical treatment sooner and aggravated her preexisting wounds. There was testimony that Scrivens was "dripping blood onto the emergency room floor" when she arrived at the hospital several hours after the beating, Tr. at 159–61, J.A. at 215–17, and that she lost a significant amount of blood, which apparently caused her to become unconscious at times during the extended trip. Tr. at 437, J.A. at 335. There was also testimony that Scrivens was so swollen from the delay in getting to the hospital that emergency room personnel had to call an IV specialist team to get an IV into her. Tr. at 175, J.A. at 231. She experienced great pain throughout the trip. Tr. at 437, J.A. at 335.

■ We are satisfied that threats of violence may constitute a "crime of violence" for purposes of § 2261(a)(2). *See* 18 U.S.C. § 16(a) ("the term 'crime of violence' means . . . an offense that has an element the use, attempted use, or threatened use of physical force against the person or property of another"). But the prosecution still must prove that these intentional acts of violence caused bodily injury to defendant's spouse or intimate partner. The statute defines "bodily injury" as "any act, except one done in self-defense, that results in physical injury or sexual abuse." 18 U.S.C. § 2266.

The prosecution argues that the threats of violence allegedly made by Page during the drive to Pennsylvania kept Scrivens from receiving medical treatment for several hours. This delay, the prosecution asserts, caused the above-described aggravation of Scrivens's preexisting injuries—in the form of bleeding and swelling—and therefore resulted in a new "bodily injury" to Scrivens for purposes of § 2261.

■ We conclude that aggravation of injuries inflicted before travel interstate may constitute a "bodily injury" for purposes of § 2261(a)(2); but, in order to establish violation of the statute, the prosecution still must prove that the defendant's intentional acts during interstate travel caused such aggravation. Where the only bodily harm sustained

during interstate travel was the worsening of a prior injury, § 2261(a)(2) requires the prosecution to prove that, during or as a result of interstate travel, the defendant "intentionally commit[ted] a crime of violence and thereby cause[d]" such aggravation. In other words, evidence that injuries inflicted in prior domestic violence were worsened during or as a result of subsequent interstate travel is, without more, insufficient to convict under § 2261(a)(2). The prosecution must also prove that the defendant intentionally committed a violent crime during interstate travel that caused the aggravation of the preexisting injuries.

■ In the present case, the proof the prosecution presented could sustain a verdict that Scrivens incurred "bodily injury" as a result of threats of violence made during the several hours of travel to the hospital. But the prosecution did not clearly communicate to the jury the theory that the continuation or aggravation of preexisting injuries may constitute bodily injury for purposes of § 2261(a)(2). Rather, its theory at trial was that Page's beating of Scrivens before travel commenced marked the onset of a "continuing assault" that caused her bodily injuries. Tr. at 665. It presented the alternative theory that swelling and bleeding could constitute distinct injuries to the District Court during arguments regarding the jury instructions, *id.* at 602, but the judge did not instruct the jury on this subject. *Id.* at 716–19. Instead, the court gave a general instruction that included only the language of the statute and some very general definitions for some of the terms employed therein. *Id.* This instruction suggested that injuries inflicted before interstate travel began could provide the basis for a conviction so long as the prosecution showed some connection between the previous violence and interstate travel. *See id.* at 716–19 (discussing the elements of interstate domestic violence); *id.* at 721 (addressing the issues of timing and intent). Because we reject this interpretation of the statute, the jury was not properly charged. We cannot uphold a jury verdict on the aggravation theory in the absence of a proper instruction outlining the elements of the theory, as set out above.

## IV.

■ Relying on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Page argues that if § 2261(a)(2) is interpreted to reach his conduct, it exceeds the power of the federal government to regulate interstate commerce. *Lopez* identified three broad categories of activity subject to federal regulation under the Commerce Clause: (1) the use of the channels of interstate commerce; (2) use of the instrumentalities of commerce; (3) and noncommercial intrastate activity that nevertheless substantially affects interstate commerce. *Id.* at 558–59, 115 S.Ct. at 1629–30. Page contends that his conduct falls outside these categories because it constituted noncommercial intrastate activity which had no impact on interstate commerce. Page's argument ignores the prosecution's alternative theory—that § 2261(a)(2) applies to his conduct during interstate travel.

Section 2261(a)(2) criminalizes only domestic violence occurring during or as a result of interstate travel that has been induced by force, coercion, duress or fraud. The Supreme Court has upheld numerous statutes criminalizing conduct that occurs during interstate travel, regardless of whether commercial activity is involved. *See, e.g., Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 255–56, 85 S.Ct. 348, 356–57, 13 L.Ed.2d 258 (1964); *Edwards v. California,* 314 U.S. 160, 172–73 & n. 1, 62 S.Ct. 164, 166 & n. 1, 86 L.Ed. 119 (1941); *Caminetti v. United States,* 242 U.S. 470, 491–92, 37 S.Ct. 192, 196–97, 61 L.Ed. 442 (1917). Relying on this authority, other courts of appeals have rejected similar challenges to different provisions of the Violence Against Women Act. *See United States v. Wright,* 128 F.3d 1274, 1275 (8th Cir.1997) (rejecting commerce clause challenge to § 2262(a)(1)); *United States v. Bailey,* 112 F.3d 758, 766 (4th Cir. 1997) (rejecting constitutional challenge to § 2261(a)(1)). Because § 2261(a)(2) requires the government to prove that the domestic violence occurred during or as a result of interstate travel, the provision was validly enacted by Congress under the Commerce Clause and may properly be applied to conduct that satisfies its elements.

## V.

■ Page maintains that the District Court erred in making several evidentiary rulings. First, he contends that the District Court should have admitted evidence of domestic violence complaints filed by Scrivens against Ed Burton, a man with whom she has cohabited and who is the father of one of her children. Page offered one complaint filed each year from 1990 through 1994 and one from September 1995, two months following the incident at issue in this case. Without clearly articulating his reasoning, Page argues that this evidence would have cast doubt on the government's argument that Scrivens was his "intimate partner" for purposes of § 2261(a). He suggests that because Scrivens was Burton's intimate partner, she could not also be his intimate partner. The prosecution concedes that Scrivens was Burton's intimate partner but urges that a person may have more than one intimate partner at a time. The District Court apparently agreed, concluding that these complaints had very little probative value and were likely to mislead the jury.

The statute defines "spouse or intimate partner" as "a spouse, a former spouse, a person who shares a child in common with the abuser, and a person who cohabits or has cohabited with the abuser as a spouse," and "any other person similarly situated to a spouse who is protected by the domestic or family violence laws of the State in which the injury occurred or where the victim resides." 18 U.S.C. § 2266. Under this definition, it is clear that Scrivens is Burton's intimate partner because they share a child. At trial, the government presented evidence that Scrivens was Page's intimate partner at the time of the attack, and Page does not challenge the sufficiency of this evidence. Instead, Page offered the domestic violence complaints to establish that Scrivens is Burton's intimate partner and that Page is not. Nevertheless, the language of the statute clearly allows the victims of domestic violence to have multiple "spouse[s] or intimate partner[s]." For instance, a woman who is divorced is the spouse or intimate partner of both her former and present husbands. Since Burton's

status has no bearing on whether or not Scrivens was also Page's intimate partner, the District Court did not abuse its discretion by excluding this evidence.

■ Page also contends that the District Court should have admitted evidence that Scrivens was convicted of drunk driving in 1993 and failed to seek treatment for drug and alcohol dependency as required by her probation order. He argues that this evidence was probative of a continuing substance dependency that would have cast doubt on her credibility as a witness and would have corroborated Page's claim that Scrivens was intoxicated and attacked on the night of July 24, 1995. The District Court acted within its discretion in refusing to admit this evidence, which bears little, if any, relevance to the issues in the case and would likely have prejudiced the jury against the victim.

The defendant also argues that the District Court improperly admitted into evidence the self-styled "Release" sent by his former attorney to Scrivens seven days following the incident. The document asked Scrivens to "release[ ] Derek Page from all claims and rights of action (civil and criminal)" stemming from the events of July 24, 1995, in exchange for payment of $450. Page contends that this document constituted an offer of compromise, inadmissible under Rule 408 of the Federal Rules of Evidence. The prosecution argues that it offered the release for the permissible purpose of proving an element of the kidnapping offense—that Page took Scrivens out of the state to avoid prosecution. Since Page was acquitted of kidnapping, and because the government makes no claim that this document is relevant to the interstate domestic violence charge, we need not pass on the admissibility of the release. For the same reasons, we shall not address Page's argument that the District Court allowed Page's former attorney to testify regarding the preparation of the release in contravention of the attorney-client privilege.

Finally, Page contends that the District Court misapplied the Sentencing Guidelines in determining his base offense level. In light of our reversal of Page's conviction, we need not address this argument. Nevertheless, we note that the Guidelines have been amended to include a provision for interstate domestic violence. *See* U.S.S.G § 2A6.2 (guideline for interstate domestic violence and stalking, effective November 1, 1997).

## VI.

Because the jury was not properly instructed regarding the scope of the offense, we must remand the case for retrial. *See United States v. Palazzolo,* 71 F.3d 1233, 1237–38 (6th Cir.1995). The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

WELLFORD, Circuit Judge, concurring.

I concur in Judge Merritt's well-reasoned opinion to the effect that we must remand this case for retrial because the jury was not adequately instructed as to the requirements of the law under the circumstances of this case.

I would note that in this case, as Judge Merritt's opinion states, "the beating had ceased" when Page coerced Ms. Scrivens into his car in Ohio for a trip to her mother's home in Pennsylvania. I would emphasize that there was no proof in this case that any physical assault or force was applied to Scrivens' body after Page and the victim left his apartment together in Ohio and he placed her in his car. The record reveals the following testimony of Scrivens:

Q. Am I correct that, from the minute you left the apartment until the time that Derek left you at the hospital in Washington, Pennsylvania, that he did not strike you, hit you, do anything of that nature?

A. Right.

Q. So the injuries that you presented with at the hospital in Washington, Pennsylvania were injuries that you suffered inside that apartment; isn't that true?

A. That's true.

Q. Once you got to the hospital, am I correct that you're in a wheelchair, and somebody some man, white man, showed

you down to the emergency room from where you were, where you first came in the hospital?

A. Derek pushed me. He was directing us to the emergency room, and he was pushing me in the wheelchair.

In light of this testimony, there is a serious question as to whether there was sufficient evidence to prove a "crime of *violence*" occurred during or as a result of the car trip. Webster's THIRD NEW INTERNATIONAL DICTIONARY (1966) offers one definition of "violence:" "exertion of any physical force so as to injure or abuse." That same source gives a second definition: "intense, turbulent or furious action; force." A proper interpretation would require a finding of physical force or intense physical action for conduct to constitute a "crime of violence." The question then becomes whether Page committed some physical offense, some forceful action against Scrivens resulting in additional, separate bodily injury during, or as a result of, the forced crossing of a state line apart from the planned assault which was concluded at Page's Ohio apartment.

The dissent's detailed description of that assault concludes:

> After the beating, Page carried his victim, who was too weak to walk and who had fallen into unconsciousness several times during the attack, and placed her into his car under threat of further violence from his gun. J.A. at 326 (Scrivens Test at 428). Page then drove around for approximately four hours, crossing state lines into Pennsylvania and intentionally passing several local hospitals....

The jury did not find, however, that Page kidnapped the victim. In addition, there was no evidence that Page actually carried a stun gun on the trip into Pennsylvania, much less any evidence that he used it. There was evidence that Scrivens assumed that Page had a stun gun and that she considered the stun gun to be a threat to her safety. Scrivens testified:

> Well, before he took me to the car, he told me, once we get outside I'm not going to make a commotion, because he was patting on his pocket up here. That's where he had that little stun gun at. He asked me would I, you know, whether or not I was going to make a commotion, and I told him no, and he carried to me to the car.

Scrivens was fearful of Page, understandably, during the trip and would have been afraid of him whether or not he issued any threat to her or carried a stun gun. I do not believe, however, that mere oral threats, or even carrying a concealed stun gun without using it, or delaying medical treatment thereby "aggravating the preexisting wounds"— alone or in combination—suffices to constitute a crime of *violence* within the meaning of the statute.

I cannot agree with Judge Moore's view that the initial beating in Ohio would constitute interstate domestic violence because it "enabled" him to force Scrivens to cross state lines later. Nor can I agree that forcing her "to travel interstate under threat of violence" and "preventing her from obtaining medical treatment, thereby causing aggravation of her preexisting injuries" necessarily constitutes interstate domestic violence or a crime of violence under the Act. All violent batterers may have a tendency to flee from the scene of their criminal violence and commission of state offenses, and may cross state lines to accomplish this. Congress has not yet made domestic violence in the home involving a female partner a federal offense, nor has it generally made assault and battery, a very prevalent crime, a federal offense. A logical interpretation of Congress' language in § 2261(a)(2) is that it is directed towards one who coerces a partner to cross a state line and then during this travel or as a result of it intentionally commits a physically forceful act that causes bodily injury to the partner. Judge Moore's reading would add a component—if there were a prior criminal violent act causing bodily injury to the partner prior to causing her to travel interstate— that prior act is part of the "course or result of" the prohibited conduct under this section.

Traditionally, state law has always dealt with the conduct involved in this case. Indeed, such actions involving "domestic relations" has, before the enactment of the statute in question, been deemed to be a prerogative of the states, not the federal government. In this regard, I note the

very recent case of *Brzonkala v. Virginia Polytechnic Inst. and State University*, 132 F.3d 949 (4th Cir.1997), which discusses the constitutionality of this Act. In *Brzonkala,* the Fourth Circuit reversed the district court and found that the Act passed constitutional muster, finding that "crimes of violence motivated by gender have a substantial adverse effect on interstate commerce." *Brzonkala,* 132 F.3d at 966–67. In reaching that conclusion, the court relied in large part on legislative history. The dissent criticized the majority's view:

> Ignoring entirely the overarching change in Commerce Clause analysis wrought by *Lopez* [514 U.S. 549, 115 S.Ct. 1624 (1995) ], the majority merely recites several statements from House and Senate committees on the general problem of violence against women and the effect of that violence on the nation economy....
>
> . . .
>
> The majority's wholesale deference to a committee finding would at least be understandable if that committee had made extensive findings deserving of deference. However, the majority ultimately sustains the constitutionality of the Act literally on the basis of a single sentence appearing in that committee report, which sentence is, itself, entirely conclusory.
>
> . . .
>
> In short, the majority opinion reads, as intended, as if *Lopez* were never decided, holding for our Circuit, explicitly on the authority of Judge Kravitch's opinion in *United States v. Wright,* 117 F.3d 1265, 1269 (11th Cir.1997), and implicitly on the reasoning advocated by the dissenting Justices in *Lopez,* that " '*Lopez* did not alter our approach to determining whether a particular statute falls within the scope of Congress's commerce Clause authority.' " *Ante* at 969. Indeed, as the majority tacitly acknowledges, with understandable reluctance, it views *Lopez,* the most significant Commerce Clause decision in more than half a century, as an aberration, a case limited in its reach to section 922(q), of Title 18, of the United States Code. See *ante* at 969 & n. 13 ("[I]t is unsurprising that 'courts have resisted urgings to extend *Lopez* beyond § 922(q).' " (citations omitted)).

*Id.* at 974–77 (Luttig, C.J., dissenting).

This judge believes that, for the reasons stated in the *Brzonkala* dissent, the constitutionality of VAWA is subject to serious question. Page, however, presents no constitutional argument in his brief, and therefore we do not address the issue.

Despite my reservations about the sufficiency of evidence where a perceived threat of violence is alleged to constitute a "crime of violence," I concur that the jury was not properly instructed about the scope of the alleged offense and that the case should be **REVERSED** and **REMANDED**, eliminating the "single episode" theory of prosecution.

MOORE, Circuit Judge, concurring in part and dissenting in part.

As a response to the "escalating problem of violence against women" and in recognition of the severe toll such crimes have on our society in terms of "health care, criminal justice, and other social costs," Congress enacted in 1994 the Violence Against Women Act ("VAWA" or the "Act"). S.REP. No. 103–138, at 37, 41 (1993) (VAWA of 1993). While in enacting the VAWA Congress was particularly concerned with those crimes which disproportionately burden women, the language of the Act's interstate domestic violence provision is gender-neutral, *see id.* at 37, and enforcement has been gender-neutral as well. *See, e.g., United States v. Gluzman,* 953 F.Supp. 84 (S.D.N.Y.1997) (upholding the indictment of a wife for the murder of her estranged husband in violation of 18 U.S.C. § 2261).

This interstate domestic violence provision, codified as 18 U.S.C. § 2261(a)(2), makes it illegal for any person to "cause[ ] a spouse or intimate partner to cross a State line ... by force, coercion, duress ... and, in the course or as a result of that conduct, intentionally commit[ ] a crime of violence and thereby cause[ ] bodily injury to the person's spouse or intimate partner...." While I agree with the majority that 18 U.S.C. § 2261(a)(2) does not exceed Congress's powers under the Commerce Clause and that this statutory

provision criminalizes the forcing of an intimate partner across state lines under threat of violence, whereby bodily injuries are aggravated during the transportation, I write separately to emphasize my disagreement with the majority's opinion in one crucial respect. It is my firm conviction that the language of this statutory provision also reaches the forcing of an intimate partner across state lines where such transportation is integrally related to a prior beating, even if that beating occurs before transportation commences. Because I believe the majority misconstrues 18 U.S.C. § 2261(a)(2) in this important respect, makes distinctions that are not mandated by the statute, and adopts an unnecessarily crabbed interpretation, I must respectfully dissent with respect to Part II and the related aspects of the majority's opinion.

## I. FACTS

The facts of this case are not unlike the story of many women who attempt to leave an abusive relationship. Like many of their experiences, Scrivens's relationship with Page started out on fairly blissful terms. Joint Appendix (J.A.) at 302–03 (Scrivens Test. at 395–96). Yet, Page soon became controlling, possessive, and even physically abusive, demanding that Scrivens stop associating with her friends and family, controlling what she could or could not wear or eat, and on one occasion even punishing her disobedience with a stun gun and mace. J.A. at 303–07 (Scrivens Test. at 396–400). In light of the deterioration in their relationship, after less than three months together, Scrivens told Page that she was moving out and ending their relationship. J.A. at 293–95, 310–311 (Scrivens Test. at 376–78, 408–09).

The planned attack against Scrivens took place when she went back to Page's in an attempt to retrieve her belongings, all of which were still in Page's condominium. J.A. at 310–19, 338 (Scrivens Test. at 408–21, 440). Upon Scrivens's arrival at Page's condominium, Page pushed her down and dragged her away from the door when she attempted to leave, and as the majority pointed out, evidence showed that he sprayed her with mace and then beat her with his fists, a claw

hammer, and a pipe wrench over the course of several hours. *See Maj. Op.* at 483. Scrivens also testified that he used a stun gun during the assault. J.A. at 318–21 (Scrivens Test. at 420–23). After the beating, Page carried his victim, who was too weak to walk and who had fallen into unconsciousness several times during the attack, and placed her into his car under threat of further violence from his stun gun. J.A. at 326 (Scrivens Test. at 428). Page then drove around for approximately four hours, crossing state lines into Pennsylvania and intentionally passing several local hospitals on the way even though Scrivens pleaded with him to stop for medical treatment at either Riverside or Ohio State University, two hospitals in the Columbus area. J.A. at 223–24, 324–26, 332 (Scrivens Test. at 167–68, 426–28, 434).

## II. STATUTORY SCOPE

Page's conduct, as presented to the jury, falls within the scope of the statutory language of 18 U.S.C. § 2261(a)(2) under at least two theories of liability. The evidence presented to the jury showed that he committed interstate domestic violence both: (1) when he beat his ex-girlfriend over the course of several hours with his fists, a claw hammer, and a pipe wrench and subdued her with mace and a stun gun enabling him to force her across state lines against her will in an attempt to evade the law, and (2) when he forced her to travel interstate under threat of violence, intentionally preventing her from obtaining medical treatment, thereby causing an aggravation of her pre-existing injuries.

### A. "In the Course of": Infliction of Bodily Injury Facilitating the Forcible Transportation of a Victim Across State Lines or the Use of Interstate Transportation to Conceal a Crime of Violence

Unlike the majority, I believe "in the course of ... that conduct" as used in 18 U.S.C. § 2261(a)(2) refers not merely to the *victim's* narrow act of crossing state lines but more generally to the *batterer's* conduct of causing his victim to cross state lines by force or coercion. Not only is this the most

logical reading of the statute grammatically, but the majority's odd construction of 18 U.S.C. § 2261(a)(2) also makes little sense given the reality of the crime and the very reasons why Congress believed federal involvement was necessary in this area that has traditionally been left to the states.

The crime of violence that took place inside Page's condominium—the beating and the use of a stun gun and mace—is precisely what *enabled* Page to force Scrivens to undergo the travel across state lines. The beating subdued his victim, rendered her in no condition to resist him physically as she was being placed into his car, and frightened her so severely that she agreed not to make any "commotion" that might attract attention and aid from others once they got outside of his condominium. J.A. at 326 (Scrivens Test. at 428). The attack also allowed Page to retain control over Scrivens during the forcible transportation. Not surprisingly, a person who has just been beaten in the manner Scrivens had been is far less physically and emotionally capable of attempting an escape, formulating a method of escape, or eliciting aid from others. The beating was an *integral* part of the forcible transportation since it enabled Page to force Scrivens on an unwilling four-hour journey the destination of which was not revealed to Scrivens until much later. J.A. at 332, 337 (Scrivens Test. at 434, 439). Consequently, the beating that took place inside Page's condominium clearly occurred "in the course of" Page forcibly "causing" Scrivens "to cross State lines."

Furthermore, evidence presented to the jury showed that Page removed Scrivens from the local area precisely because he feared the consequences of his having harmed her and knew that interstate travel would make it more difficult for police authorities to hold him liable for his crime. J.A. at 324–25 (Scrivens Test. at 426–27). It is difficult to believe that Congress intended to exclude from this statute's purview the beating of an intimate partner by a batterer who then forcibly transports his victim across state lines under threat of further violence in order to avoid detection from the law. What is ironic about the majority's opinion is that the inadequacy of state law enforcement was one of the main reasons for which federal legislation dealing with domestic violence was thought to be necessary. The VAWA was intended to deal with those batterers who carry or force their intimate partners across state lines as part of a domestic violence incident in an attempt to conceal their crimes. *See* Abraham Abramovsky, *Interstate Domestic Violence and Murder: Are They the Same?*, N.Y. L.J., July 12, 1996, at 3. Those who enacted the VAWA's interstate domestic violence provision recognized that batterers were using interstate travel as a loophole in the system of state law enforcement and that crimes of domestic violence "because of their interstate nature, transcend the abilities of State law enforcement agencies." S.REP. No. 103–138, at 42–43, 62 (1993) (VAWA of 1993). For example, when batterers take their victims across state lines, local authorities often encounter difficulties subpoenaing hospital documents and witnesses from other states. *See* Robert Ruth, *Second Ohio Man Guilty in Federal Violence Cases*, THE COLUMBUS DISPATCH, Apr. 13, 1996, at 3B. The majority's narrow perspective blinds it from the "bigger picture"—from seeing that this incident is precisely the type of situation for which a federal domestic violence statute would be needed and which 18 U.S.C. § 2261(a)(2) was intended to cover.

While the majority discounts the suggestion that its interpretation would limit the reach of 18 U.S.C. § 2261(a)(2) to those rare situations where the batterer is driving with one hand while hitting his victim with the other, the reality is that its interpretation reads a distinction into the statute that is not very logical in light of the nature of domestic violence crimes. Page's crime of violence was committed as much "in the course" of forcing Scrivens across state lines as that of a man who beats his intimate partner while standing in the driveway with one foot in his car, or the man who beats his intimate partner while parked at various highway rest stops. The sad truth about domestic violence is that the batterers may well be intelligent people who appear to the rest of society to be upstanding, respectable citizens. At minimum, these batterers are sufficiently intelligent to realize that their chances of being

held liable for the abuse of an intimate partner are dramatically higher when they beat their intimate partners outside on the driveway in front of the neighbors or at rest stops populated twenty-four hours a day, rather than inside the home behind closed doors and drawn curtains. Congress very appropriately entitled Title II of the VAWA, the domestic violence section which contains, as a small part, the interstate domestic violence provision, "Safe *Homes* for Women." S.REP. No. 103–138, at 43 (1993) (VAWA of 1993) (emphasis added). One reason why our society has taken so long to accept domestic violence as a crime against society is the fact that it typically does not occur in public places among strangers, but in the privacy of one's own home among intimate partners. *See* Kerrie E. Maloney, *Gender–Motivated Violence and the Commerce Clause: The Civil Rights Provision of the Violence Against Women Act after Lopez,* 96 COLUM. L.REV. 1876, 1886 & n.38 (1996). To assume that Congress intended to criminalize only those beatings occurring precisely during travel but not those occurring inside a home that enable the further violence of forcible interstate travel or that are concealed by use of interstate travel would be to suggest that Congress somehow missed the boat.

## B. "In the Course of": Aggravation of Injuries During Forcible Interstate Travel

I agree with the majority that forcibly taking an intimate partner whom the batterer has just severely beaten into unconsciousness across state lines thereby causing the aggravation of her injuries is a "crime of violence" causing "bodily injury" to that person in violation of 18 U.S.C. § 2261(a)(2).

The majority correctly points out that one commits a crime of violence not merely when one *actually* uses force, but also when one *threatens* the use of force. In the instant case, the government presented evidence that Page threatened the use of a stun gun against Scrivens's person in order to obtain her cooperation in being transported across state lines. Page kept the stun gun in his pocket and made certain Scrivens knew he had easy access to it during the ride. J.A. at 326 (Scrivens Test. at 428). Moreover, while they traveled interstate, Page also threatened to push Scrivens out of the car and to leave her on the side of the road where no one would ever find her. J.A. at 334 (Scrivens Test. at 436). This conduct is, without a doubt, an act of violence both as a matter of logic and as a matter of law.

As for what constitutes the causing of "bodily injury," nowhere does the statute suggest that the bodily injury must be an injury newly inflicted, completely distinct from the prior criminal actions of the batterer. As recognized by the majority, such a limitation would make little sense. Under Judge Wellford's interpretation, Page's actions would not constitute a crime of interstate domestic violence even if Scrivens had bled to death or gone into shock during and as a result of[1] the forcible transportation simply because the death or shock would not have been "separate" from Page's prior criminal conduct towards Scrivens which occurred before transportation commenced. Yet, there is no relevant distinction between a person who forcibly prevents his intimate partner from obtaining medical care forcing her to bleed to death, a person who forcibly prevents his diabetic intimate partner from obtaining insulin shots forcing her to fall into a coma, and a man who forcibly prevents his intimate partner from obtaining food and water for several days forcing her to suffer renal failure. Any prior criminal actions of any of these batterers should in no way weaken or negate the observation that these three situations are analogous and that in all of these scenarios the batterer has committed a crime of violence causing bodily harm.

1. In addition to my disagreement with the majority regarding the interpretation of "in the course of" as discussed in the previous section, I must also object to how the majority equates the term "as a result of" with "after." *See Maj. Op.* at 485. An event (X) that results from another (Y) does not necessarily need to follow it in the sense that the beginning of event X can precede the end of event Y, especially when event Y spans a lengthy period of time as interstate travel might. In other words, a crime of violence does not have to take place after the travel completely ends in order for one to say that the crime of violence was the result of the travel.

We note as well that the seriousness of the bodily injury is not a proper basis for negating criminal liability under 18 U.S.C. § 2261(a)(2). Whether or not one is guilty of interstate domestic violence does not depend on the seriousness of the bodily harm suffered by the victim. The fact that the victim in *United States v. Bailey*, 112 F.3d 758 (4th Cir.1997), suffered permanent damage does not render Page any less culpable under 18 U.S.C. § 2261(a)(2). The statute clearly shows that the degree of harm inflicted on the victim is instead to be taken into account at the sentencing stage pursuant to 18 U.S.C. § 2261(b).[2]

### III. CONSTITUTIONALITY

Because under either of the above interpretations of 18 U.S.C. § 2261(a)(2) the triggering factor is the movement of the victim across state lines, it is clear to me that this statute is a valid exercise of Congress's power under the Commerce Clause to regulate the "use of the channels of interstate commerce."[3] *United States v. Lopez,* 514 U.S. 549, 558, 115 S.Ct. 1624, 1629, 131 L.Ed.2d 626 (1995) (describing the first category of activity Congress is empowered to regulate under the Commerce Clause). The Supreme Court recently reiterated the well-settled principle that "the transportation of persons across state lines" is a "form of 'commerce.'" *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine,* — U.S. ——, ——, 117 S.Ct. 1590, 1596, 137 L.Ed.2d 852 (1997) (citing its prior decisions in *Edwards v. California,* 314 U.S. 160, 172, 62 S.Ct. 164, 166, 86 L.Ed. 119 (1941), and *Caminetti v. United States,* 242 U.S. 470, 491, 37 S.Ct. 192, 196–97, 61 L.Ed. 442 (1917)). In *Caminetti,* the Court upheld the White Slave Traffic Act of 1910 under which the defendant had been convicted of transporting and causing to be transported a woman across state lines for the purpose of prostitution or debauchery and rejected the argument that the statute exceeded Congress's powers under the Commerce Clause because the purpose of debauchery was unrelated to commerce. *See id.* at 484–85, 488 n. 1, 491, 37 S.Ct. at 194, 195 n. 1, 196–97. Title 18 U.S.C. § 2261(a)(2) is similarly constitutional under the Commerce Clause because the interstate domestic violence provision's requirement of "the crossing of a state line ... plac[es] the [commission of a crime of violence causing bodily injury] squarely in interstate commerce." *Bailey,* 112 F.3d at 766 (analogizing the commission of a crime of violence causing bodily injury to "the debauchery forbade in *Caminetti*"). Any arguably intrastate nature or timing of the crime of violence is irrelevant, just as it was with respect to the prostitution/debauchery in *Caminetti.*

### IV. JURY INSTRUCTIONS

Given my position that either Page's beating of his ex-girlfriend before interstate travel or his subsequent acts of violence during interstate travel, as presented to the jury, could as a matter of law provide a sufficient basis for liability under 18 U.S.C. § 2261(a)(2), I see no error with the jury instructions and likewise no need to remand this case for a new trial.

### V. CONCLUSION

I concur with the majority's conclusion that 18 U.S.C. § 2261(a)(2) is a valid exercise of Congress's powers under the Commerce Clause and as well with respect to Part V of the majority's opinion relating to various evidentiary issues raised by the appellant. However, to the extent the majority rejects

---

**2.** Title 18 U.S.C. § 2261(b) specifically distinguishes between those situations in which the victim dies, those in which the victim suffers "permanent disfigurement or life threatening bodily injury," those in which the victim sustains "serious bodily injury," and "any other case."

**3.** My analysis under the first *Lopez* category should in no way be interpreted as foreclosing either the second or third *Lopez* category as a valid basis for upholding the constitutionality of 18 U.S.C. § 2261(a)(2) under the Commerce Clause. *See Lopez,* 514 U.S. at 558–59, 115 S.Ct. at 1629–30 (concluding that Congress is "empowered [secondly] to regulate and protect ... persons or things in interstate commerce" and finally to regulate "those activities having a substantial relation to interstate commerce"). I have chosen to limit my discussion to this first category simply because this was the focus of the government's arguments on appeal. Appellee's Br. at 14–15.

the view that 18 U.S.C. § 2261(a)(2) reaches those situations where a beating of an intimate partner is integrally related to the subsequent transportation of the victim across state lines by force and to the extent the majority feels it needs to remand this case for a new trial, I respectfully dissent. I would affirm the district court's decision not to overturn the jury's guilty verdict.